IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | Criminal No. 2:10-CR-747-DCN |
| vs. | ) | |
| | ) | |
| KENNY SMITH, | ) | **ORDER AND OPINION** |
| | ) | |
| Defendant. | ) | |
| ______________________________________ | ) | |

This matter is before the court on defendant's motion to suppress. Defendant argues that multiple items of drug-related evidence, three firearms, and a variety of ammunition seized pursuant to a state search warrant should be suppressed because the search warrant was not based on probable cause, or in the alternative, it was based on stale probable cause. In addition, defendant argues that police officers obtained statements from him regarding the firearms without providing the warnings required by Miranda v. Arizona, 384 U.S. 436 (1966). The government filed a response in opposition on September 17, 2010, and this court held a suppression hearing on September 20, 2010. For the reasons set forth below, the court denies defendant's motion.

## I. BACKGROUND

On July 1, 2009, the City of Charleston Police Department (CPD) executed a search warrant at 125 Line Street, Apartment A, Charleston, South Carolina. According to the government, during the search, officers seized a burgundy bag from defendant's bedroom. The bag contained a black ski mask, latex gloves, a loaded .22 caliber handgun, and a loaded .45 caliber handgun. Officers also seized a .22 caliber rifle; .22,

.32, and .45 caliber ammunition; a Pyrex dish and two spoons with cocaine residue; and a box of baking soda from defendant's bedroom. In the kitchen, the officers discovered cocaine residue in the microwave oven. When officers removed the .22 caliber rifle from the residence, the government claims that, upon seeing it, defendant spontaneously admitted that he owned the rifle, along with other firearms in the residence. Officers arrested defendant for manufacturing crack cocaine and possession with intent to distribute crack cocaine in proximity of a school. On July 14, 2010, a federal grand jury indicted defendant for being a felon in possession of a firearm and ammunition, in violation of 18 U.S.C. §§ 922(g)(1), 924(a)(2), and 924(e).

On September 10, 2010, defendant filed a motion to suppress the drug-related evidence, the firearms and ammunition, and defendant's statements regarding the firearms. Defendant argues that the search warrant affidavit "did not provide the magistrate [with] probable cause to believe that drugs would be at the residence," and in the alternative, the probable cause in the search warrant affidavit was stale by the time the warrant was executed. Mot. Suppress 2. Defendant also argues that his statements claiming ownership of the guns resulted from implicit questioning by CPD officers prior to defendant receiving Miranda warnings.

The government filed a response in opposition on September 17, 2010. The government asserts that the search warrant contained adequate probable cause, and even if the warrant affidavit lacked sufficient probable cause, the resulting search was still valid under the good faith exception to the exclusionary rule articulated in United States v. Leon, 468 U.S. 897 (1984). The government asserts that the probable cause did not

become stale in the six days between issuance and execution of the search warrant. In response to defendant's Miranda allegation, the government argues that defendant's statements were voluntary and not in response to any form of questioning while he was in police custody.

On September 20, 2010, this court held a suppression hearing. The court received copies of the search warrant and the search warrant affidavit as court exhibits, and Lieutenant Sterling Dutton, CPD, testified. The sworn affidavit of Investigator Bryant Gilmore states the following:

> Within the past seventy-two hours, the Charleston Police Department's Narcotics Unit initiated a narcotics investigation at 125 Line Street[, A]partment A located in the city and county of Charleston, SC 29403. Investigators utilized a confidential informant (CI) to make a controlled purchase of cocaine base from an unknown black male. The CI was equipped with a video/audio recording device to record the transaction.
>
> The C/I was observed walking into the area of Ashe and Line St. The C/I made contact with a B/M suspect at 125 Line [St., Apt.] A. The C/I walked into the residence, retrieved cocaine base from the suspect and completed the transaction with a sum of [pre-recorded U.S.] currency taken from the official CPD Narcotics Fund. Once the transaction was completed, the C/I left the residence and walked back to a predetermine[d] location where investigators retrieved the cocaine base which tested presumptive as such. Inv. Gilmore reviewed the video recording following the transaction and it is clear that the transaction took place inside of 125 Line St[., A]partment A.
>
> Based on the above information and observations of experienced Narcotics Investigators, it is reasonable to believe that cocaine base and/or the proceeds thereof are located inside the residence of 125 Line Street[,] Charleston, SC 29403.

Court Exhibit #2. A state magistrate signed the search warrant and supporting affidavit on June 25, 2009.

Lieutenant Dutton testified that the drug purchase discussed in the search warrant affidavit occurred on June 23, 2009. Referencing an investigative file in his possession, Lieutenant Dutton testified that officers had conducted a previous controlled purchase of crack inside the same residence on May 20, 2009. Lieutenant Dutton stated that copies of operational plans for the controlled purchases indicate that approximately 0.4 grams of crack were purchased on each occasion, and the drugs purchased field-tested positive as crack. Lieutenant Dutton said he did not know the amount of government funds used to purchase the crack in each instance, and the operational plans did not indicate the identity of the drug dealers or the presence of weapons inside the apartment. Lieutenant Dutton stated that he had no knowledge of whether an undercover officer accompanied the confidential informant (CI) on either drug purchase or whether Investigator Gilmore had ever been inside 125 Line Street, Apartment A, prior to obtaining the search warrant. Based on his experience, Lieutenant Dutton further testified that locations where crack is manufactured and sold remain open as long as they have the drug available for sale and are used repeatedly for this purpose. When asked if a six-day delay between issuance and execution of a search warrant is common, Lieutenant Dutton responded that it happens occasionally because the necessary manpower to execute the warrant is not always available.

Lieutenant Dutton testified that during the execution of the search warrant, he remained on the front porch of the residence with defendant and a Ms. Marie Campbell, who also lived in the apartment. Both defendant and Ms. Campbell were detained during the search. At some point during the search, an officer exited the residence and showed

Lieutenant Dutton a .22 caliber rifle, which was subsequently seized as evidence. According to Lieutenant Dutton, defendant spontaneously stated that the .22 caliber rifle belonged to him, and he had other firearms inside the residence. Lieutenant Dutton stated that he had no knowledge of whether officers had read the Miranda warnings to defendant prior to his statements.

## II. DISCUSSION

The Fourth Amendment to the United States Constitution states that

> [t]he right of people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV. "Probable cause exists where 'the facts and circumstances within their (the officers') knowledge and of which they had reasonably trustworthy information (are) sufficient in themselves to warrant a man of reasonable caution in the belief that' an offense has been or is being committed." Brinegar v. United States, 338 U.S. 160, 175-76 (1949) (quoting Carroll v. United States, 267 U.S. 132, 162 (1925)). "In determining whether a search warrant is supported by probable cause, the crucial element is not whether the target of the search is suspected of a crime, but whether it is reasonable to believe that the items to be seized will be found in the place to be searched." United States v. Lalor, 996 F.2d 1578, 1582 (4th Cir. 1993) (citing Zurcher v. Stanford Daily, 436 U.S. 547, 556, 557 n.6 (1978)).

> In [United States v. Anderson, 851 F.2d 727 (4th Cir. 1988)], this court adopted the rule that "the nexus between the place to be searched and the items to be seized may be established by the nature of the item and the

> normal inferences of where one would likely keep such evidence." Id. at 729. The court held that probable cause can be inferred from the circumstances, and a warrant is not invalid for failure to produce direct evidence that the items to be seized will be found at a particular location.

Lalor, 996 F.2d at 1582.

The determination of whether probable cause exists to issue a warrant rests with "a neutral and detached magistrate instead of being judged by the officer engaged in the often competitive enterprise of ferreting out crime." Johnson v. United States, 333 U.S. 10, 14 (1948). "An affidavit must provide the magistrate with a substantial basis for determining the existence of probable cause." Illinois v. Gates, 462 U.S. 213, 239 (1983). "Sufficient information must be presented to the magistrate to allow that official to determine probable cause; his action cannot be a mere ratification of the bare conclusions of others." Id. "[P]robable cause requires only a probability or substantial chance of criminal activity, not an actual showing of such activity. Id. at 245 n.13. In addition, a court must recognize that a magistrate's determination of probable cause "should be paid great deference by reviewing courts . . . ." Spinelli v. United States, 393 U.S. 410, 419 (1969).

The search warrant affidavit states that within seventy-two hours prior to June 25, 2009, CPD Narcotics Unit officers used a confidential informant (CI) to purchase a quantity of crack from an unknown black male at 125 Line Street, Apartment A, Charleston, South Carolina. The affidavit does not specify the amount of pre-recorded government funds used to purchase the crack; however, it states that the CI did, in fact, purchase a quantity of a substance that field-tested positive for crack. The affidavit

reflects that the affiant, Investigator Gilmore, personally reviewed a video recording of the controlled purchase and was able to identify 125 Line Street, Apartment A, as the location of the transaction.

The court finds that the information contained in the search warrant affidavit provides sufficient probable cause to support issuance of a search warrant. A controlled purchase of crack from a residence captured on video adequately provided the magistrate with the "probability or substantial chance of criminal activity" showing necessary to issue a search warrant. Gates, 462 U.S. at 245 n.13. The court acknowledges, however, that inclusion of the May 20, 2009 controlled purchase in the search warrant affidavit, and perhaps testimony at the suppression hearing as to whether Investigator Gilmore verbally provided additional investigative information to the magistrate, would have greatly enhanced the quality of the probable cause for the search warrant.

Had this court not found sufficient probable cause to support issuance of the search warrant, the resulting search would still be valid under the good faith exception to the exclusionary rule found in United States v. Leon. In Leon, the Supreme Court held that evidence seized pursuant to an invalid search warrant should not be suppressed if a police officer's reliance on the magistrate's probable cause determination was objectively reasonable and in good faith. 468 U.S. at 919-22. In the instant case, there is no indication that the officers' reliance on the search warrant was objectively unreasonable or lacked a good faith basis. Defendant did not present any testimony or evidence indicating that Investigator Gilmore purposefully or recklessly misled the magistrate with false information in his affidavit, that the magistrate abandoned his or her judicial role, or

that the warrant was so facially deficient that an officer could not reasonably believe it to be valid. See id. at 923.

Defendant argues that if the warrant affidavit contained probable cause, the probable cause became stale by the time the officers executed the search warrant. In addition to the six-day delay in executing the warrant, defendant places great emphasis on the fact that the probable cause was based on one drug transaction, not "drug sales . . . of 'a protracted and continuous nature.'" Mot. Suppress 3. Defendant also contends that there was no reason to conclude that crack would be found at the apartment approximately a week after the drug transaction took place.

"This court has already cautioned the police about the need to specify time periods in warrant applications." Lalor, 996 F.2d at 1582 (citing Anderson, 851 F.2d at 729-730 n.1). However, "[a]s we have made clear, '[t]he vitality of probable cause cannot be quantified by simply counting the number of days between the occurrence of the facts supplied and the issuance of the affidavit.'" United States v. Farmer, 370 F.3d 435, 439 (4th Cir. 2004) (citing United States v. Rhynes, 196 F.3d 207, 234 (4th Cir. 1999)) (quoting United States v. McCall, 740 F.2d 1331, 1336 (4th Cir. 1984)) (other citations omitted). "'Rather, we must look to all the facts and circumstances of the case, including the nature of the unlawful activity alleged, the length of the activity, and the nature of the property to be seized.'" Farmer, 370 F.3d at 439 (citing Rhynes, 196 F.3d at 234) (quoting McCall, 740 F.2d at 1336).

In the search warrant affidavit, Investigator Gilmore specified that within seventy-two hours prior to June 25, 2009, the CPD Narcotics Unit initiated a drug investigation

and used a CI to make a controlled purchase of crack at 125 Line Street, Apartment A. Considering "*all* the facts and circumstances of the case," as required by Farmer, there are enough facts to refute defendant's arguments. Id. (emphasis added). Lieutenant Dutton testified that at least one other controlled purchase of crack occurred in the same apartment slightly more than one month prior to the June 23, 2009 transaction. In addition, Lieutenant Dutton testified that "crack houses" usually remain active while drugs are available for sale and the same locations will often be used repeatedly for this purpose. Since crack was available for sale in the same apartment at least two times over a span of more than one month, it is reasonable to conclude that crack or related contraband would be present at the same location eight days after purchasing the drug there. It is also significant to note that the search warrant's list of property to be seized was not simply limited to crack and related proceeds. The nine-paragraph list consists mostly of items such as books, records, receipts, bank statements, photographs, and indicia of occupancy. Ct. Ex. #2. Even if a particular "crack house" runs out of product to sell, the court finds it likely that these documentary items may still be found at that location.

The court finds no merit in the argument that the delay between issuance and execution of the search warrant caused the probable cause to become stale. The CPD Narcotics Unit executed the search warrant six days after it was issued, well within the ten-day period required by the state magistrate in the warrant, and eight days after the June 23, 2009 controlled purchase. Lieutenant Dutton testified that delays in the execution of search warrants sometimes occur due to practical considerations, such as the

availability of manpower. Other courts have found similar delays to be reasonable. See United States v. Wilson, 491 F.2d 724, 725 (6th Cir. 1974) (six-day delay to conceal identity of informant held to be reasonable); United States v. Rael, 467 F.2d 333, 336 (10th Cir. 1972) (five-day delay because of insufficient personnel to execute search warrant held to be reasonable); United States v. Nepstead, 424 F.2d 269, 271 (9th Cir. 1970) (six-day delay held reasonable); United States v. Dunnings, 426 F.2d 836, 840-41 (2d Cir. 1969) (nine-day delay to effect arrest of defendant held reasonable).

"[T]he prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." Miranda, 384 U.S. at 444. A defendant must be informed of the right to remain silent, that anything said can or will be used against the individual in court, the right to an attorney, and the right to an appointed attorney if the individual cannot afford an attorney. Id. at 467-73. If a defendant is not subjected to "official" interrogation, the Fifth Amendment and Miranda are not implicated. United States v. Kimbrough, 477 F.3d 144, 147 (4th Cir. 2007) (citing Illinois v. Perkins, 496 U.S. 292, 297 (1990)). However, "the Supreme Court has broadened the concept of interrogation to include either 'express questioning or its functional equivalent.'" Id. (quoting Rhode Island v. Innis, 446 U.S. 291, 300-301 (1980)) (certain discussions between police officers within earshot of a defendant can constitute the functional equivalent of express questioning).

"[A]s Miranda and its progeny make plain, confessions given freely and without compelling state influences are admissible and indeed, desireable. 'Volunteered

statements of any kind are not barred by the Fifth Amendment . . . .'" Kimbrough, 477 F.3d at 149-50 (quoting Arizona v. Mauro, 481 U.S. 520, 529 (1987)) (internal citations omitted).

According to Lieutenant Dutton's testimony, an officer executing the search warrant came out of the apartment and showed Lieutenant Dutton a .22 caliber rifle, which was found inside. Defendant and Ms. Campbell had been detained and seated near Lieutenant Dutton at that time, and no evidence presented to the court indicates that defendant had been advised of his Miranda rights.

Defendant argues that the officer's display of the firearm to Lieutenant Dutton was the functional equivalent of questioning by the police, or an implicit question, demanding a response from defendant as to the weapon's ownership. The court finds, and the government concedes, that defendant was in police custody at the time the firearm was shown to Lieutenant Dutton; however, the court is not willing to make the leap that a subordinate police officer's display of a seized weapon to his superior during the execution of a search warrant is the functional equivalent of police interrogation. Lieutenant Dutton testified that to the best of his knowledge, the officer carrying the rifle did not make any statements or ask any questions, he simply showed Lieutenant Dutton the rifle. Lieutenant Dutton also testified that neither he nor any other officers asked defendant if he owned the rifle or any other firearms inside the apartment. The court finds that defendant's statements regarding ownership of the guns were spontaneous, voluntary statements and not the product of explicit or implicit custodial interrogation by the officers present. Accordingly, the Fifth Amendment and Miranda are not implicated,

and the statements are admissible as evidence.

## III. CONCLUSION

For the reasons set forth above, the court **DENIES** defendant's motion to suppress.

**AND IT IS SO ORDERED**.

**DAVID C. NORTON**
**CHIEF UNITED STATES DISTRICT JUDGE**

**October 12, 2010**
**Charleston, South Carolina**